that the court which made it should pass upon it in the first instance. Wilson v. Barney, 5 Hun, 257, 260.

The order should be modified in accord with this opinion, and as modified affirmed, without costs. All concur.

(79 App. Div. 277.)

ULSTER COUNTY v. STATE.

(Supreme Court, Appellate Division, Third Department. January 14, 1903.)

1. TAXES—DISPOSITION—CONSTRUCTION OF STATUTE.

Laws 1869, c. 907, as amended by Laws 1871, c. 283, providing that "all taxes," except school and road taxes, collected in any town on the assessed valuation of any railroad in said town, for aid in the construction of which road said town has issued or shall issue bonds, shall be paid over to the treasurer of the county in which said town lies, and the money shall be used as a sinking fund for payment of such bonds, relates solely to the disposition of the taxes authorized to be collected under existing tax laws, and includes taxes levied and collected for state, as well as county and town, purposes.

2. ACTION BY COUNTY—MONEY HAD AND RECEIVED—CLAIM AGAINST STATE.

Under Laws 1859, c. 312, providing that the state tax which each county is to pay shall be assessed by the county supervisors, and included in and collected by the annual collection of taxes in the several counties, in the manner prescribed by law, on failure of the supervisors to do which they may be proceeded against by the comptroller to compel them to do it, and Laws 1855, c. 427, § 2 providing that the county treasurers shall by a certain time pay to the state treasurer the amount of the state tax, if any, raised and paid over to them, and section 12, providing that in case of their neglect to do so they may be compelled to do so by action by the attorney general, the county is not a debtor to the state for the state tax apportioned to be raised in it; and a county treasurer, having paid to the state all its tax, without deducting the part collected on the assessed value of railroads in towns, for aid in construction of which roads the towns have issued bonds, though Laws 1869, c. 907, as amended by Laws 1871, c. 283, provides such part of the tax shall be paid over to the county treasurer as a sinking fund for payment of the bonds, the county, given by Laws 1899, c. 336, such rights in reference thereto as the town would have against the state were it an individual, may recover as for money had and received.

Smith and Chester, JJ., dissenting.

Appeal from court of claims.

Action by the county of Ulster against the state of New York. From a judgment dismissing the claim of the county, it appeals. Reversed.

The proceeding was commenced August 10, 1899, under the provisions of chapter 336 of the Laws of 1899, to recover from the state $42,890.10, the amount of taxes collected from and paid by railroads in the towns of Ulster county bonded to aid in the construction of such railroads, and paid by the county treasurer to the state.

Argued before PARKER, P. J., and SMITH, KELLOGG, CHASE, and CHESTER, JJ.

John J. Linson (John F. Cloonan, of counsel), for appellant.

John C. Davies, Atty. Gen., and George H. Stevens (O. B. Glezen, of counsel), for respondent.

Johnson & Charles, for Wyoming County.

KELLOGG, J.   Laws 1869, c. 907, as amended by Laws 1871, c. 283, relates solely to the disposition of the taxes authorized to be levied and collected under the then existing tax laws.   The act does not pretend to change the general scheme or existing method of raising money by tax.   It simply says that money raised through existing methods from railroad property in bonded towns, for whatever purpose, shall be paid to the treasurer of the county, to be used for a special purpose there stated.   This says all taxes so raised, and the taxes authorized to be levied and collected under the general law were taxes to defray the expenses of state government, the expenses of county government, and the expenses of town government.   The charitable purpose of the act of 1869 was doubtless based upon the idea that since these towns, by bonding, had in a measure created a taxable property within their limits, such towns had some equitable claim upon the taxes assessed thereon for a period of years, or so long as the bonds were unpaid.   This would not interfere with the equitable right of any other town in the county, nor with the rights of any other county in the state.   It was new property created by the bonded towns.   In any event, it is not disputed but that the legislature had the power to direct the disposition of these taxes; nor is there room to doubt that it did dispose of all the taxes on this property authorized to be raised for any purpose whatever.   I suppose that, if the legislature had said that the taxes so assessed on these railroads should be paid by the county treasurer to the state superintendent of public instruction for school purposes, there would be no question as to the right of the treasurer to deduct such payment from the amount to be sent to the comptroller for state uses; and I fail to see that the person to whom payment is to be made or the purpose to be served by such payment makes any difference, so long as the state has power to determine for itself the disposition of the tax.

The contention that, notwithstanding the state has directed the appropriation of the tax to a specified object, still the county must reimburse the state for the taxes so by the state devoted to such special object, has no support in the act of 1869; nor can it have, in my opinion, in the general tax laws, or in any other law.   It would be a great injustice to the towns not bonded to require them to make good to the state money so by the state appropriated in aid of the bonded towns.   It must be borne in mind that the sum which the plaintiff was called upon to pay for state uses is based upon the valuation of all taxable property in the county, including the valuation of the railroad property in bonded towns.   If such railroad property constituted one-half in valuation of the entire property of the county, it is plain that the gross sum required to be paid to the state would be double what it should be if the railroad property were left out; and the property in the county, other than the railroad property, would be burdened unjustly and unequally as compared with other counties of the state,— a condition which the legislature has shown no intention of creating.

Section 8, c. 312, Laws 1859, after providing for equalization of values between counties of the state, provides:

"The comptroller shall immediately ascertain from the assessment the proportion of state tax each county shall pay and send a statement of the amount

by mail to the county clerk, and chairman and clerk of the board of supervisors of each county."

Section 9 provides:   ·

"The amount of state tax which each county is to pay, so fixed and stated by the comptroller as aforesaid, shall be assessed by the supervisors or other officers authorized to make the assessment of state taxes, in the tax roll of the calendar year, * * * and shall be included in and collected by the annual collection of taxes in the several counties in the manner prescribed by law."

In case of failure by the board of supervisors to do this, the comptroller may proceed by mandamus to compel this to be done.

Section 2 of chapter 427 of the Laws of 1855 provides:

"The several county treasurers shall, on or before the first day of March in each year, pay to the treasurer of this state the amount of the tax, if any, raised and paid over to them respectively, retaining the compensation to which they may be entitled."

Section 12 provides that, in case of neglect of the treasurers to pay over the moneys by them received, they may be compelled to do so by action brought by the attorney general. This is the present law, except the time of payment has been changed from March 1st to April 15th and May 1st.

It will be seen from this that the state tax is to be collected like the taxes for county and town purposes; that the amount to be levied in any county is based upon the valuation of all the taxable property in the county; that the state relies upon the county and town officials to obtain the state tax by the methods pointed out in the tax law; that it does not make the county a debtor to the state for the state tax apportioned to be raised in any county, but exacts from the county and town officials the performance of duties which will result in the collection of the state tax. This is made further apparent from the provisions of the tax law which impose the collection of taxes on nonresident lands upon the comptroller, and in that respect relieves the county and town officials from all duty respecting the collection of such taxes. While I think that it is or must be conceded that the state has a right to do as it pleases with the state tax, when collected, and while it is or must be conceded that by the act of 1869 it disposed of a portion of the tax by directing that all state taxes collected on railroad property in bonded towns should be held by the county treasurer for the benefit of the towns bonded, I fail to see how it can be fairly reasoned that the state in fact gave up no portion of its state tax. The fact is that the portion of the state tax which by the terms of the act of 1869 it surrendered to the bonded towns was received by the state without reference to this previous disposition. There can, I think, be no doubt that, if this were a transaction between individuals, the party aggrieved by the action of any third person in paying over the money might recover in a suit for money had and received, and it seems that if, under the facts, such an action would lie between individuals, the act of 1899 (chapter 336) gives a right of action against the state. The county is, by that act, to be treated as · possessed of all the rights of the bonded towns, and the original right

of action by the bonded towns in equity preserved and confirmed in the county.

The judgment of the court of claims should be reversed, with costs, and a new trial granted.

CHASE, J., concurs.

PARKER, P. J. I cannot concur with the theory, adopted by the court below, that the state did not intend to itself bear any of the burden which the bonds issued for the purpose of constructing the new railroads in the several towns imposed upon those towns. Nor do I agree that chapter 907 of the Laws of 1869 does not change "the action of the board of supervisors or the duties of the comptroller in determining the amount of the state tax chargeable to each county" in which such newly created property exists.

The argument to sustain such theory is that no amendment is made to the general tax laws of the state; that under such laws the supervisors must still return to the comptroller the total assessed valuation as it appears upon the tax rolls of the county; that upon such valuation the comptroller estimates the amount which is the county's share of the whole state tax, and that, when the county is notified of that amount, it is its duty to pay to the state that amount, even though it for any reason fails to collect it; that such amount, under the general tax laws, becomes a debt from the county to the state, and that, so long as those laws remain unchanged, such method of levying the state tax must be followed, and the county does in each year become liable to the state for the amount so fixed; that the act of 1869 itself does not make any change in this method, and that none should be inferred therefrom, unless it appears in plain and distinct language; that hence the amount which the state has annually received from the county of Ulster was in all respects regularly levied, and was no more than it was entitled to receive. To this I answer that no question of sharing a burden can arise in the case. The railroad property affected by the act of 1869 was new property, created by the bonded towns, and for the construction of which it issued the bonds. By omitting to place this new property upon the assessment roll of the county, the total valuation of the county's property would not be at all diminished. By appropriating the taxes raised from it to a purpose other than the expenses of government, no less taxes would be available for that purpose than were raised before. The statute of 1869, therefore, imposed no burden upon either town, county, or state. It simply left matters as they stood before. It operated to prevent an increase of the assessment roll and of the taxes collected, but it diminished nothing.

It is true that no change was made in the method of ascertaining the amount which a county was to pay of the state taxes; nor are there any specific directions, in the act of 1869 or elsewhere, which change the method of making up the return to the comptroller of the aggregate valuation of the assessment rolls of the county; nor does the act of 1869 in terms provide that such railroad property shall not be included in the assessment rolls, but it does in clear and explicit terms

provide that no taxes collected from such property (except those that are levied and collected by the local officers in highway and school districts) shall be applied to the purposes of taxation. Beyond all controversy, such act effectually prohibits the taxing of such new-made property for the purpose of raising any part of the sum which the state may ask from the county. Clearly, the provisions of the act of 1869 cannot be observed, if the value of the railroad property is to be included in the valuation of the property in the county which is to pay taxes therein. Under the tax laws, the sums needed for town expenses and for county expenses are to be raised from all property therein liable to taxation. The collection of all taxes in the county, for whatever purpose needed, must be made up on that basis. Therefore an act which prevents the use of any species of property for that purpose in fact operates to exempt such property from taxation, no matter in what language it is phrased. When a statute provides that none of the taxes raised upon such railroad property shall be applied to the payment of taxes, but shall be paid over to a trustee for the benefit of a specified sinking fund, it very effectually exempts such property from that which is, under the general tax laws, required to be placed upon the assessment rolls as property amenable to taxation. True, the statute describes the sum which is to be paid into the sinking fund, as "taxes"; but it is clear that they are not "taxes," nor is that property to pay "taxes," within the meaning of the general tax laws. The machinery of such laws is by the act of 1869 utilized for the purpose of collecting from the railroad company an annual sum, from which the town bonds may be finally paid; but, by the same act, it is forbidden to use such machinery for the purpose of collecting from such property "taxes," properly so called. No sum may be collected against such property for the purpose of paying governmental expenses, either of town, county, or state.

The situation, then, is this: By its general tax laws the state provides that each county shall pay its quota of the annual state expenses, estimated upon the aggregate valuation of its property appearing upon its assessment rolls. Under the provisions of such laws, none but property liable to taxation is to be placed upon such rolls, and evidently the scheme of such laws is to enable the county to collect by taxation the sum which is so ascertained and demanded by the state from it. Subsequently the state by another act prohibits the county from collecting by taxation against a specified portion of its property any taxes whatever. By the act of 1869 it clearly said to the county of Ulster: "You may not collect from the new railroad property within your limits any portion of the sum which hereafter will be demanded from you as your share of the state's annual expenses." That such is the effect of the act of 1869 is beyond controversy.

Now, reading all those laws together, is it to be supposed that the state intended to require the county of Ulster to include within its assessment roll the value of the new railroad property, and to report it as a part of the aggregate valuation, upon which its share of the state expense was to be ascertained? Was it the states intention to

make the county value it as a basis of ascertaining the county's liability, but to prohibit it from collecting therefrom anything to assist in discharging that liability? On the contrary, it is clear to me that the act of 1869 can be given a just and intelligent operation only by considering it as exempting such railroad property from the taxable property of the several towns. This provision of the act should be read into the general tax laws of the state, and in making up the assessment rolls of the several bonded towns the railroad property should never have been placed thereon as property liable to taxation. Indeed, this statute has been substantially so construed in Clark v. Sheldon, 106 N. Y. 104, 12 N. E. 341; and it is difficult to understand how the act of 1869 is explicit enough to remove such railroad property from assessment and taxation for town and county purposes, yet not explicit enough to remove it from taxation for the purpose of raising the county's share of the state tax; and more difficult yet is it to understand how it is specific enough to remove such property from taxation for the purpose of satisfying the state's claim, but not clear enough to prevent it from being included in the estimate by which the state's claim is ascertained.

In my judgment, the various amounts claimed in this action were not regularly assessed and collected by the state against the county. They were estimated upon a wrong basis. The board of supervisors of the county erred in including the valuation of the railroads in the amount that it returned to the state comptroller, and the state's claim against the county was, therefore, in each year, too large. Hence it has in fact received a larger sum in such years than it was lawfully entitled to. Much of this money, so overpaid to the state, the county has refunded to the towns. Some of it, as I understand the case, has never been refunded. The act of 1899, under which this proceeding has been instituted, authorizes a recovery by the county if a cause of action is shown against the state, either in behalf of the county or the town, and provides for a proper division of the recovery between them. The state having received moneys to which it was not entitled, it should, ex æquo et bono, refund it; and under the provisions of the act of 1899 that seems to be sufficient to allow a recovery in this proceeding.

In my opinion, the judgment appealed from should be reversed, and a new trial granted.

SMITH, J. (dissenting). By section 264 of the Code of Civil Procedure it is provided that, where jurisdiction to hear and determine a claim is conferred upon the court by a special law, the liability of the state is not thereby implied, but such a claim is subject to defense and counterclaim by the state in the same manner and to the same extent as if presented under a general law. The act which authorizes the consideration of this claim by the court of claims provides that no judgment shall be rendered against the state unless the facts proven shall make out a case against the state which would create a liability were the same established in evidence in a court of law or equity against an individual or corporation. It is apparent, therefore, that this enabling act has given to the claimant no better cause of action than was had

before its passage, and I understand the attorney for the appellant claims nothing therefrom.

This action, then, involves the construction of chapter 907 of the Laws of 1869, as amended by chapter 283 of the Laws of 1871. The act in question is entitled "An act to amend an act entitled 'An act to authorize the formation of railroad corporations and to regulate the same,' passed April 2, 1850, so as to permit municipal corporations to aid in the construction of railroads." The act then provides for a petition to the county judge for the right to issue municipal bonds for railroad stock, for the determination by the county judge whether a majority of the taxpayers and taxable property desire the bonding, for the appointment of railroad commissioners, and for the issue of bonds, and then provides:

"All taxes except school and road taxes collected for the next thirty years, or so much thereof as may be necessary, in any town, village or city, on the assessed valuation of any railroad in said town, village or city, for which said town, village or city has issued, or shall issue, bonds to aid in the construction of said railroad, shall be paid over to the treasurer of the county in which said town, village or city lies, and said money so paid over, including interest collected on bonds held by said treasurer as a sinking fund, shall be invested by said treasurer in state, city, town, county or village bonds, issued pursuant to law of this state, or United States bonds, within sixty days after receiving the same, and shall be held by said county treasurer as a sinking fund for the redemption and payment of the bonds issued or to be issued by said town, village or city, to aid in the construction of said railroad."

These taxes collected upon this railroad property in some instances were not turned over to the treasurer of the county for the purposes stated, but passed with the other taxes to the benefit of the county. The full amount of state taxes assigned to each county were paid by the county to the state. Thereafter the bonded towns, for whose benefit was inserted this provision in the law, sued the county to recover back the amount of taxes so diverted to general purposes, which should, under the law, have been set apart for a sinking fund. In these actions they succeeded. Thereupon the county of Ulster, having paid to the several towns the amount of taxes so diverted, has made this claim against the state to recover back from the state what is claimed to be the amount of these taxes unlawfully diverted, which were received by the state as state taxes. The court of claims has held that the county was not entitled to recover, and from the judgment entered upon their direction this appeal is taken.

By section 58 of the general tax law it is provided that the clerk of the board of supervisors shall, on or before the second Monday in December, transmit to the comptroller a certificate or return of the aggregate assessed and equalized valuation of the real and personal estate in each tax district as the valuation of such real estate has been corrected by such board, and the amount of taxes assessed thereon for town, city, school, county, and state purposes. This railroad property was clearly property that was assessed within the county. Taxes were paid thereupon, and such taxes as were assessed thereupon for school and road purposes were devoted to such purposes. In the certificate or return of the clerk of the board of supervisors, made to the comptroller, he was required to include this property according to the very letter of the law. Upon these re-

turns the state board of equalization equalizes the valuations, the same as the county board of equalization equalizes the valuations between the several cities and towns therein. The state tax rate is determined by the legislature from these aggregate valuations, which contain, by the letter of the law, the assessment of this railroad property. The comptroller then certifies to each county the amount of taxes which must be paid by each county. His duty is simply ministerial in applying the tax rate to the equalized valuation of a county. This amount, so certified by the comptroller, is required to be paid to the state from the taxes first collected in the county. The amount must be paid in full, and is subject to no reduction whatever for taxes uncollected or lost. It will thus be seen that the state taxes, a part of which are sought to be recovered back, were assessed and paid in exact accordance with the law. The clerk of the board of supervisors was required to include the valuation of this property as taxable property in his report to the comptroller. The state board of equalization were required to make their equalization upon the valuations returned by the clerks of the boards of supervisors. The comptroller was required to compute his tax upon the valuations made by the state board of equalization. The county treasurer was required to pay from the taxes first collected the full amount certified by the comptroller as the amount due from that county. It would seem to follow that the payment under the requirement of the law of a tax, estimated and computed by the state officers in strict accordance with the law, could furnish no ground, legal or equitable, for an action for the return of the same. If the statute had gone further, and provided that the clerk of the board of supervisors, in certiying to the comptroller the assessable valuation of taxable property, should omit this property, or had provided that the state board of equalization should deduct the value of this railroad property, or had provided that the state comptroller, in determining the amount for which each county should be liable, should deduct any amount on account of the provisions of the act of 1869, the intent of the legislature would have been made plain to compel the state to contribute to the help of these bonded towns as well as the county. But none of these provisions were made, and there is no express provision of law diminishing the contribution of each county to the support of the state by reason of this diversion of certain of the taxes collected as a sinking fund for these bonds. In fact, it is not claimed that the statute is express; but the appellants would find some implied modification of the general statutory law as to the collection of state taxes, so that the county, by reason of the appropriation of these particular taxes to the payment of these bonds, should have allowance therefor in the amount which they contribute to the state.

Those who claim an implied modification of the law are not agreed as to just at what point that law should be impliedly modified. Some argue that, because these taxes collected are devoted to a special purpose, the property is exempt, and that the clerk of the board of supervisors should not, therefore, return to the comptroller this property as part of the assessable property of the county. Others argue that, while the clerk of the board of supervisors is required

by law to return all the assessable property in a county, the state board of equalization should make allowance therefor in equalizing the valuations of the different counties throughout the state. Others claim that the state comptroller, in computing the amount which the county must contribute to the state taxes, is required to take into consideration this special appropriation of the taxes from this railroad property. Still others claim that the county treasurer need pay to the comptroller only a part of the amount required from each county, deducting the amount which would naturally be assessable to the railroad property. But none of these claims are free from difficulty. If it be claimed that by reason of the appropriation of part of the taxes from the railroad property to pay the bonds of the towns bonded for their construction the property had become exempt, it may be answered that it is assessed generally for school and road purposes, and it is clearly not exempt property, although part of the taxes paid thereon is diverted from the purposes of general taxation. The claim that the state board of equalization or the comptroller should make allowance for these taxes so diverted, either in the equalization, or in the estimate, or in the computation of the amount of taxes due from a county, would seem to fall by reason of the fact that neither the comptroller nor the state board of equalization have before them what part of the assessed property was railroad property. The statute requires the certification of the aggregate valuation of the assessed property only, and nowhere is the clerk of the board of supervisors directed to return to the comptroller what part of that property was railroad property subject to the provisions of the act of 1869. The remaining claim, that the county treasurer should deduct from the taxes demanded the proper amount, would find a practical difficulty in the explicit command of the statute that he shall pay this amount from the moneys first collected, and also from the fact that the amount had been estimated from the valuation equalized by the state assessors, and not necessarily from the valuation certified by the clerk of the board of supervisors. This would also result in a deficiency in the amount estimated as necessary to pay the expenses of the state, against which the law will clearly presume.

These difficulties are suggested, not for the purpose of holding that they are insurmountable, if the intent of the legislature were clear that the state should bear its share of the contribution for the help of the bonded towns, but as cogent evidence that it was never intended by the legislature that any contribution should be made by the state at large. Is the legislature presumed to have passed a law which would result every year in a deficiency of moneys necessary to be raised for the state expenses? Appellant has argued that the state has power to make its tax rate what it will, and can make allowance for this deficiency by a slightly increased state rate. The answer to this argument lies in the fact that no state department has knowledge of facts from which can be determined what the deficiency will be for which allowance could be made. The county board of supervisors, who alone have this knowledge, are not required to certify the amount of assessed railroad property. This argument and

its answer only emphasizes respondent's contention that, if the state had intended to contribute to this burden, some provision could and would have been made in the general tax law, whereby the state would be protected from a yearly deficiency which is the inevitable result of the appellant's construction of the law. Nor can appellant answer that the state may as well suffer the deficiency as the county. In the first place, the county always must provide for some deficiency. Under the general tax law, the tax collectors pay to the localities in full the moneys collected for them and the balance is paid to the county. If, then, any taxes for any reason are unpaid, the loss comes to the county, to be made up by the next tax levy. But the county need suffer no deficiency. The board of supervisors have official knowledge of the amounts of railroad property, the taxes from which are to go to this sinking fund. The tax rate fixed in view of this knowledge could lead to no deficiency on account of this diversion of those taxes.

This problem in its final solution comes to the actual intent of the legislature, whether to make both state and county contribute to the help of the bonded towns, or to require the county alone to make the contribution. It will not do to say that it was the intent of the statute to make the property which it created pay the debt of the towns by which in part it was created. This railroad property assessed is not property created by the statute. The real property, which forms a large proportion in value of the property assessed, has, before the incorporation of the railroad, been property assessed within the town and compelled to bear its share of the public expense. It is not unnatural that the statute should compel a county to come to the rescue of an overburdened town within its borders, It might well be assumed that the property within the county is to an extent benefited by the improvements within the towns within that county. Upon the same principle, not many years ago, it was provided in certain cases a county should bear part of the expense for the construction of bridges, which would otherwise be town charges. Is it not much less probable that the legislature ever intended that the state at large should contribute to the burdens of these bonded towns? The benefit to the state at large is too remote upon which to base any such presumption.

Again, as has been stated, the liability of the state to contribute to the burdens of these towns must be found in some implied modification of the statutory machinery for the collection of state taxes. The rule of statutory construction has been long settled that the state will never be presumed to have surrendered any rights, and that such surrender must be found in express statutory enactment. In Black, Interp. Laws, at page 316, the rule is stated:

"In general, however, the rule is well settled that statutory grants of property, franchises, or priveleges in which a government has an interest, are to be construed strictly in favor of the public and against the grantee, and nothing will pass except what is granted in clear and explicit terms."

In the same authority, at page 119, the rule is stated:

"General words in a statute do not include nor bind the government by whose authority the statute was enacted, where its sovereignty, rights, pre-

rogatives, or interests are involved. It is bound only by being expressly named or by necessary implication from the terms and purpose of the act."

The author proceeds:

"If the government is not expressly referred to in a given statute, it is presumed that it was not intended to be affected thereby, and this presumption, in any case where the rights or interests of the state would be involved, can be overcome only by clear and irresistible implications from the statute itself. Generally speaking, therefore, the state is not bound by the provisions of any statute, however generally it may be expressed, by which its sovereignty would be derogated from, or any of its prerogatives, rights, titles, or interests would be devested, save where the act is specifically made to extend to the state, or where the legislative intention is too plain to be mistaken."

It is the same principle which holds statutes of exemptions to a strict construction. This principle of construction negatives the intention claimed by the appellant to make the state a joint contributor with the county for the benefit of these towns. For the county to recover in this action, it must appear from the law that the state has voluntarily surrendered part of the property from which it derives revenues, thereby increasing the burdens upon other property throughout the state. In my judgment, it does not so appear, and the judgment of the court below should be sustained.

CHESTER, J., concurs.